**In re RENE B.**

**No. 87–427–Appeal.**

Supreme Court of Rhode Island.

June 29, 1988.

Thomas M. Bohan, Dept. of Children and their Families, David McKenna, Providence, for plaintiff.

Francis B. Brown, Court Appointed Special Advocate, Paula Rosin, Asst. Public Defender (respondent), William F. Fidalgo (respondent), for defendant.

OPINION

KELLEHER, Justice.

In October 1986 the Department for Children and Their Families (DCF) filed a petition in Family Court to terminate the parental rights of a Woonsocket couple to their son who was five years old at that time. This petition came on for a hearing before a Family Court justice in the spring of 1987. A few days after the hearings had ended, the trial justice gave a bench decision in which he granted the termination petition. Hereafter we shall refer to the mother as Mary and to the father as Ray.[1]

---

**1.** The names Mary and Ray are pseudonyms.

The DCF sought the termination of Mary's rights on two statutory grounds. One ground is set forth in G.L. 1956 (1981 Reenactment) § 15-7-7(b)(1), as amended by P.L. 1984, ch. 204, § 3, which authorizes termination if the parent suffers from an emotional or mental illness or mental deficiency for such duration as to render it improbable that the parent could care for a child for an extended period. The DCF also sought termination of both parents' rights pursuant to § 15-7-7(c). Section 15-7-7(c) calls for termination when the child has been in state care for at least six months and the trial justice finds that integration of the child into the parents' home is improbable in the foreseeable future owing to parental conduct or conditions that are unlikely to change.

During the four-day trial, the trial justice heard testimony from several individuals who were employed by, or whose services were procured by, DCF or the Northern Rhode Island Community Health Center (mental health center). The witnesses included social workers, a psychologist, a case manager, a psychiatrist, and a "registered, independent social worker" who was qualified by the trial justice to testify as an expert in the areas of child, family, or adult sexual abuse.

A case manager for the mental health center testified that she had been Mary's case manager since August 1984 and Ray's case manager since August 1985. This witness reported that on September 3, 1985, Mary was admitted to Woonsocket Hospital because "she was in a manic state." Rene, who was with his mother at the hospital emergency room, was then taken into custody by DCF and placed in a shelter. In mid-October 1985 Mary was discharged from the hospital to go into a group home where she stayed until late November 1985, when she returned home.

According to the case manager, after Mary's discharge the mental health center monitored Mary's medications and provided other services such as home visits, almost daily counseling, and referrals to appropriate low-income agencies. The case manager, along with the DCF social worker, for-

mulated a case plan for the reunification of the family. The target date for the reunification was the end of the summer of 1986. The case manager testified that from January 1986 until May or June 1986 Mary and Ray complied "almost to the letter" with the reunification plan and their mental-health treatment plan. Sometime in May 1986 Mary and Ray decreased their almost daily contacts with the mental health center to the point where they were in attendance about every other week.

In late August Mary's counselor told her that Rene had been involved as the aggressor in a sexual episode with another child in the foster home. The expert in child sexual abuse evaluated Rene, and he expressed the opinion that in the light of "respective major psychiatric dysfunction of each parent, coupled with [Rene's] disturbed behavior, the viability of reunification must be seen as extremely guarded."

In late summer DCF decided to abandon the plan for reunification. Other factors that precipitated the abandonment were the "increased tension" and "bickering" between the parents and their difficulty in adjusting to a financial budget.

A week following Labor Day 1986, the case manager learned that Mary was again "in a manic state" and shortly thereafter was hospitalized. Mary's hospitalization began on September 3 and ended October 31, 1986.

A staff psychiatrist at the mental health center testified that Mary was suffering from a psychiatric disorder involving major swings of mood that were characterized by periods of extreme energy and elation with alternative periods of extreme depression. Although medication therapy had stabilized Mary's condition, the psychiatrist reported that she is unstable when she is "being noncompliant with her medication." This witness predicted that to a reasonable degree of medical certainty, Mary would continue to discontinue her medication periodically.

Mary told the trial justice that she stopped taking her medication in September 1986 when she heard that her parental rights to her son would be terminated. Ac-

cording to Mary, she ignored the advice of her counselor and doctor because she felt she had "nothing to live for." She also stated that her attendance at the mental health center dropped off during the summer of 1986 because of a desire of both her and her husband to pursue recreational activities such as "browsing around stores" and going to Rocky Point Amusement Park.

There is evidence in the record that Ray was unable to fulfill the role as Rene's father. A representative of the mental health center testified that during one of Mary's hospitalizations, Ray went almost daily to the mental health center for guidance about the ordinary tasks of daily living. He also exhibited a competitive relationship with Rene for Mary's attention and Rene's toys.

In his bench decision, the trial justice made the following findings of fact: DCF and the mental health center had made "reasonable efforts" to work with the parents to reunify them with their child; there had been no change of circumstances since the child had been taken into state custody in September 1985; the parents "had not made a good faith effort to adjust their circumstances and conditions" to facilitate the return of the child; no lasting adjustment by the parents could be effectuated; and the integration of the child into the parents' home was "improbable." Although the trial justice found that the love of the parents for Rene was genuine, he emphasized that Rene needed permanency. The trial justice went on to observe that Rene's continuance in foster care would not be in his best interest.

The parents' appeal has two facets, as follows:
1. Did the trial justice err in terminating the parental rights of Mary and Ray?
2. Did the trial justice err in admitting into evidence certain health-care information relating to Mary?

Mary contends that when the state relies upon § 15-7-7(c), DCF must show that the parents are at fault. She emphasizes that the statute requires the trial justice to consider a parent's good-faith effort to adjust

his or her conduct in the attempt to facilitate the return of the child. Alternatively, she argues, even if DCF is not required to establish fault, the termination of parental rights violates a parent's right to due process. In addition she argues that the trial justice erred in finding that DCF made reasonable efforts to reunify her family. She further stated that DCF "simply waited for [her] to 'slip-up' once" and failed to pursue reasonable alternatives short of termination of her parental rights.

Ray contends that the trial justice did not follow the dictates of the statute and therefore abused his discretion in terminating his parental rights. He also argues, like Mary, that DCF's efforts at reunification fell far short of what would be expected of the agency.

Recently in *In re Kristina L.*, 520 A.2d 574, 579 (R.I. 1987), we noted that controversies involving the termination of parental rights involve a balancing of three interests: those of the state, the child, and the natural parents. We also emphasized that § 15-7-7(c) requires the state to prove that (1) the child has been in the care of a child-placement agency for six months; (2) reasonable efforts had been made to reunite the family; and (3) it is improbable in the foreseeable future that the child will be returned to the parents' home because of conduct or conditions that are unlikely to change. Here there is no dispute that Mary, despite her mental illness, is capable of providing proper care, provided she conforms to her medication program. Unfortunately, it is clear that Mary cannot care for herself or Rene when she fails to take her medication.

Of significant interest at the termination trial was Mary's psychiatrist, who described her prognosis as "guarded" and expressed the belief that Mary will have future episodes in which she will discontinue her medication. Her on-again, off-again behavior has also been demonstrated by her precipitous decrease in attendance at the mental health center after six months of almost daily attendance. The evidence also discloses that her discontinuance of her medication required hospitalization.

Although Rene has not suffered any physical harm, the record contains evidence that he has suffered emotional harm as a result of his unstable home environment.

Despite Ray's assertions to the contrary, the record is clear that he is unable to care for Rene on his own. The case manager testified that Ray was unable to prepare a meal for his son and his interaction with Rene was inappropriate. When Mary testified, she also reported that her husband could not care for Rene.

Here the testimony of the case manager, Mary's psychiatrist, and Mary support the trial justice's actions. Furthermore, the evidence clearly indicates that DCF had made reasonable efforts to reunite the family, including the design of an appropriate case plan, monitoring Mary's mental health treatment, and coordinating visits with Rene.

In determining whether DCF had sustained its burden in regard to Mary, the trial justice's focus was not on her illness but rather on whether she had effectuated a change in her conduct or a change in the conditions that required DCF to make Rene a ward of the state and remove him from his parents' residence. The record clearly demonstrates that she failed to maintain necessary contacts with her counselors at the mental health center nor did she abide by the requirements of the reunification plan that she continue to take the medications that were so essential to the control of her mental illness. If Mary was looking for a reason why the proposed reunification never took place, she should focus on her failure to adhere to the plan. What has been said about Mary can also be said about Ray.

■ In reviewing the record made in the Family Court, this court is required to examine the record to determine whether the findings of the trial justice are supported by legal and competent evidence. We shall not disturb the findings of the trial justice unless he or she has overlooked or misconceived material evidence or his or her decision was clearly wrong. *In re Crystal A.,* 476 A.2d 1030, 1033 (R.I. 1984). The evidence adduced in this controversy clearly and convincingly demonstrates that DCF has made a genuine and diligent effort to effectuate the reunion of Rene with his parents. The fact that this effort went for naught is attributable to Mary's failure to persevere during the treatment process and to Ray's complete inability to function as a parent.

■ Mary's claim that the trial justice erred when he permitted the mental health center's psychiatrist to testify about her illness brings us to a consideration of G.L. 1956 (1985 Reenactment) § 9–17–24. The General Assembly, at its January 1986 session, amended chapter 17 of title 9, with the addition of section 24, which in its pertinent part provides that in any legal action, whether civil or criminal, no health-care provider shall be competent to testify concerning any information about a patient without the consent of the patient. Public Laws 1986, ch. 341, § 1. The legislation also specifies four situations in which the health-care provider would be required to disclose such pertinent information. However, none of the four exceptions are relevant to termination of parental rights.

According to Mary's appellate counsel, the 1986 amendment was a response to our holding in *Bartlett v. Danti,* 503 A.2d 515 (R.I. 1986), in which this court ruled that a portion of the Confidentiality of Health Care Information Act, G.L. 1956 (1976 Reenactment) § 5–37.3–6, as amended by P.L. 1985, ch. 395, § 1, was unconstitutional. The act exempted confidential health-care information from compulsory legal process. This proviso failed to pass constitutional muster because it interfered with the subpoena power of the judiciary and removed from the court's discretion the determination of the admissibility of otherwise relevant evidence.

Before us Mary's counsel has gone to great lengths to show that the constitutional infirmities present in *Bartlett* are not present in the 1986 amendment. We see no necessity for considering any constitutional issue.

When the legislation that ultimately became § 9–17–24 was introduced into the

Rhode Island Senate on March 14, 1986, the legislative counsel's explanation of its contents was that "this act would provide that health care information and communications to health care providers concerning a patient would be privileged communications."

Mary's appellate counsel, in her brief, describes § 9–17–24 as a privilege statute. The use of the term "privilege" brings us to § 15–7–7, which states that notwithstanding the provisions of chapter 37.3 of title 5, no privilege of confidentiality may be invoked with respect to any illness, trauma, incompetency, addiction to drugs, or alcoholism of any parent. Section 15–7–7 deals with the termination of parental rights and, in its crystal-clear language, speaks for itself.

It is the duty of the judiciary to construe the different statutory provisions so as to make them consistent, harmonious, and sensible. In construing the 1986 amendment in the light of the earlier-enacted § 15–7–7, we presume that the General Assembly did not intend to enact antagonistic legislation. With these principles in mind, we would point out that the significant portion of § 15–7–7 comes after the reference to chapter 37.3 of title 5 and states that

"no privilege of confidentiality may be involved with respect to any illness, trauma, incompetency, addiction to drugs or alcoholism of any parent."

This language tells the reader in clear and simple language that in parental-termination proceedings, a parent may not invoke any privilege of confidentiality relating to the parent's illness or any maladies mentioned in § 15–7–7.

In this litigation Mary's mental illness was certainly a subject that was worthy of investigation by the Family Court, particularly in determining where Rene's best interests lay. In this litigation the privilege afforded the health-care provider or recipient must yield to the direct, specific mandate set forth in § 15–7–7.

Consequently the appeals of Mary and Ray are denied and dismissed, and the decree entered by the Family Court justice is affirmed.

FAY, C.J., did not participate.