**In re ARIEL N. et al.**

**No. 2005–43–Appeal.**

Supreme Court of Rhode Island.

Feb. 1, 2006.

Marie T. Roebuck, Providence, for Respondent.

Karen A. Clark, Providence, for DCYF.

Frank P. Iacono, Jr., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The respondent mother, Joyce N. (respondent or mother), appeals a decree of the Family Court terminating her parental rights to her three minor children, Ariel N. (born on October 2, 1993), Alicia G. (born on January 18, 1996),[1] and Aaron N. (born on August 4, 2001) (collectively children).

This case came before the Supreme Court for oral argument on December 12, 2005, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that this appeal may be decided at this time without further briefing or argument. For the reasons hereinafter set forth, we affirm the judgment of the Family Court.

---

1. Alicia G. is occasionally misidentified in court paperwork as Alicia N., N. being the first letter of the surname of her mother and her two siblings. We refer to her by her legal name, Alicia G.

# I

## Facts and Travel

Ariel, Alicia and Aaron first encountered the foster care system when the children were discovered, with their mother, attempting to walk from Newport to Providence. On December 7, 2001, the Department of Children, Youth and Families (DCYF) filed a petition with the Family Court requesting that the state take temporary custody of the children. Ariel and Alicia have lived with the same foster parents since their placement, and those foster parents now seek to adopt them. Aaron was placed with a separate foster family, who facilitated visits between Aaron and his sisters. Currently, the possibility exists that the foster parents of Ariel and Alicia may be able to adopt Aaron as well. On March 5, 2004, DCYF filed petitions with the Family Court for involuntary termination of parental rights with respect to all three children, a prerequisite to the children's adoption.

A hearing was held with respect to these petitions on May 3, 2004, in the Family Court. The respondent did not appear at the hearing, but she was represented by counsel. Her attorney told the court that respondent had contacted him a week earlier and informed him that she would not be present at the hearing. The respondent's attorney told the court that respondent was aware that the hearing was taking place on that particular day and that respondent had been present at a previous court proceeding when the hearing date had been set. During the hearing, respondent's attorney cross-examined DCYF's witness and presented a brief closing argument. He did not call any witnesses, and he told the court that he had no witnesses because respondent had chosen not to appear and had not assisted the attorney in preparing her case.

Kathy Whiteman (caseworker), a DCYF social worker who had been involved with the children since their placement in 2001, testified for DCYF. According to the caseworker, from the inception of DCYF's involvement with the children, respondent did not cooperate with offered services arranged to address her mental health and other issues. Despite attempts to transport respondent to outpatient mental health services set up by DCYF, respondent refused to attend appointments. In February 2002, respondent left Rhode Island and returned to New Jersey. The caseworker tried to improve respondent's relationship with her children even after respondent's departure from the state. When respondent returned to Rhode Island in September 2002, she was evaluated at the Providence Center, but she denied having any problems and did not continue treatment at that facility. The caseworker also referred respondent for counseling to address lingering abuse-related issues from respondent's childhood. The respondent attended only two sessions and then ceased participating. The respondent briefly entered a program at Advent House in Providence, but was discharged unsuccessfully when she left Rhode Island once again for New Jersey in March 2003. After that move, the caseworker attempted to make arrangements with child welfare officials in New Jersey and considered placing the children in New Jersey to be closer to their mother. However, child welfare authorities in New Jersey determined that the proffered kinship placements in that state were unsuitable.

The caseworker also testified that respondent rarely visited her children and had only sporadic contact with them. For a fifteen-month period prior to the hearing, respondent did not see her children. She last saw her children in February 2003. The caseworker encouraged respondent to write to her children to maintain

some contact. Eventually, in August 2003, respondent began writing occasional letters or cards to her children. She sent the last correspondence in January 2004, roughly four months before the hearing.

After the caseworker completed her testimony and after respondent's counsel completed his cross-examination of the caseworker, the trial justice offered respondent's counsel the chance to call witnesses. He declined, but he did engage by giving a closing argument. The trial justice then found that DCYF had met its burden of proof and terminated respondent's rights concerning all three of her children on July 8, 2004, on two grounds: first, that during her children's twelve-month placement in foster care, respondent was offered services to correct the situation; and second, that respondent abandoned the children. The respondent filed a timely notice of appeal on July 30, 2004.[2]

## II

### Analysis

On appeal, respondent argues that the trial justice abused his discretion when he terminated her parental rights. First, respondent asserts that the trial justice's ruling that respondent was defaulted after proper notice was unsupported by the record and in conflict with precedent. The respondent also asserts that the trial justice should not have proceeded with the hearing in her absence. Second, respondent argues that the trial justice erred when he found that DCYF had met its burden of proof regarding the allegations in its petition: first, that respondent had failed to take advantage of services offered

by DCYF; and second, that respondent had abandoned her children.

■ This Court reviews termination of parental rights rulings by examining the record to establish whether the hearing justice's findings are supported by legal and competent evidence. *In re Rene B.*, 544 A.2d 137, 140 (R.I.1988); *see also In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005). The findings of a trial justice are entitled to great weight and will not be disturbed unless the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *In re Shawn B.*, 864 A.2d at 623.

### A

### Respondent's Absence from the Hearing

The respondent asserts two interrelated errors stemming from her failure to appear at the termination hearing. First, respondent argues that the trial justice erred when he made a finding that respondent was defaulted. Second, respondent argues that the trial justice erred by allowing the hearing to go forward in respondent's absence without further inquiry into whether respondent's absence was voluntary.

### 1

### Default

■ The trial justice's decree reflects a number of factual findings. In the first sentence, the decree notes that respondent was defaulted after proper notice. Our previous holdings indicate that an entry of default is improper when a parent is represented by counsel at a termination hearing, even if the parent does not appear. *Cf.*

---

2. The putative father of Ariel and Alicia and the putative father of Aaron had both been defaulted with respect to the termination of their parental rights after appropriate notice and publication. Neither of the biological fathers participated in the hearing or in this appeal.

*In re Brandon A.,* 769 A.2d 586, 589 (R.I. 2001) (holding that appearance at a preliminary hearing by a parent's counsel, even in the parent's absence, does not constitute default).

■ Although we agree with respondent that no default occurred in this proceeding, we disagree with respondent that one instance of erroneous wording is sufficient to invalidate the balance of the decree. Although the trial justice did use the word "default" in one instance to refer to respondent in the decree, this terminology did not reflect the true nature and results of the hearing. Both biological fathers at issue in this case were, in fact, defaulted; their interests were not represented at the hearing. By contrast, respondent was represented at the hearing by her attorney, who participated actively in the proceeding by cross-examining the state's witness and presenting arguments to the court. Since the use of the term "defaulted" in the decree did not affect respondent's rights, nor would the removal of such a word alter the trial justice's findings in any way, it is our opinion that the Family Court's mistake in using the word "defaulted" was harmless error.

### 2

### Voluntary Absence

■ This Court has long acknowledged that "parents are entitled to procedural due process before the termination of their parental rights." *In re Brandon A.,* 769 A.2d at 590. However, respondent parents have "no absolute right to be physically present at the termination hearing." *Id.*; *see also In re Ginger G.,* 775 A.2d 255, 257–58 (R.I.2001) (citing *Lassiter v. Department of Social Services,* 452 U.S. 18, 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and holding that no right to confrontation applies because termination of parental rights is a civil and not a criminal

proceeding). Still, "[a]lthough the termination of parental rights is a civil, not a criminal proceeding, * * * the termination of parental rights is a significant event in which a parent's due process rights reasonably should be protected." *In re Ginger G.,* 775 A.2d at 258. We have integrated these principles in Rhode Island through several key cases that have refined the requirements in termination of parental rights cases.

In *In re John P.,* 458 A.2d 1085 (R.I. 1983), we held that an absent respondent was adequately represented by her guardian ad litem even when her attorney had withdrawn his appearance, based on the guardian ad litem's actions in the proceeding. *Id.* at 1086. In that case, the guardian examined witnesses and "took other steps to represent his absent ward." *Id.* at 1085. We later held in *In re Ginger G.* that a guardian ad litem's passive participation meant that a termination hearing erroneously proceeded in the absence of the respondent mother, or any meaningful representation of her interests, without a finding by the trial justice that the respondent mother's absence was voluntary. *Id.* at 258–59. We specified in that case that where an absent respondent is *not* adequately represented at the hearing, the trial justice must make a finding as to whether respondent's absence was voluntary. *Id.* at 258.

■ Central to the rubric of *In re Ginger G.* and *In re John P.* is the idea that "entirely passive" representation of an absent respondent's interest will not suffice. *In re Ginger G.,* 775 A.2d at 258 (considering the fact that the guardian ad litem in *In re John P.* " 'was present, examined witnesses and took other steps to represent his absent ward' " as having been dispositive in that case); *In re John P.,* 458 A.2d at 1085. The instant case

does not merely meet the standard set forth in *In re John P.* and refined in *In re Ginger G.*, but rises above it. Not only was the respondent in the case at bar represented by an attorney rather than a guardian ad litem, but the attorney unquestionably took an active role in the proceeding by his presence, his cross-examination of the opposing witness, and his closing argument.

The respondent relies heavily on our decision in *In re Ginger G.* to support her contention that the termination hearing should not have proceeded in her absence. To that end, the respondent cites *In re Ginger G.*, in which we stated that a Family Court justice must make findings of fact about why a respondent in a TPR hearing was absent and, at a minimum, determine the reason for the absence and whether the absence was voluntary or non-voluntary. *In re Ginger G.*, 775 A.2d at 258–59. However, we prefaced that requirement with the explicit modifier applying those additional safeguards to cases in which the respondent parent was *not* adequately represented: "In cases *such as this,* wherein the *pro se* parent failed to appear, *no attorney represented the parent,* and the guardian ad litem did nothing to protect the absent parent's rights, a Family Court justice must make findings on the reasons why the respondent in a termination of parental rights hearing was absent." *Id.* at 258 (first and third emphases added). As stated above, the factual circumstances here are easily distinguished from those that provided the basis for the *In re Ginger G.* holding. Because the respondent mother in the instant case was, in fact, represented by counsel, the requirement set forth in *In re Ginger G.* that the trial justice make findings of fact as to the reasons for the respondent's absence did not apply.

## B

### DCYF's Allegations

■ The respondent also asserts as error the trial justice's finding that DCYF met its burden of proof with respect to the termination of parental rights petition. Before the state may terminate parental rights, due process requires the state to "support its allegations by at least clear and convincing evidence." *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). When we review a ruling terminating parental rights, we examine the record to determine whether the trial justice's findings are supported by legal and competent evidence. *In re Rene B.,* 544 A.2d at 140. The findings of a trial justice are entitled to great weight and will not be disturbed unless the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *In re Kristen B.,* 558 A.2d 200, 204 (R.I.1989).

The procedures for terminating parental rights are found in G.L.1956 § 15–7–7. The statute provides that the court may terminate a parent's rights "if the court finds as a fact by clear and convincing evidence," § 15–7–7(a), any of several proposed factual scenarios, including:

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, * * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

"(3) The child has been placed in the legal custody or care of the department for children, youth and families for at least twelve (12) months and the parents were offered or received services to correct the situation which led to the child

being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; or

"(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion." Section 15–7–7(a).

In their petitions to terminate respondent's parental rights, DCYF presented all three of these allegations. The trial justice found that DCYF proved by clear and convincing evidence its allegations based on § 15–7–7(a)(3)(4). We need only review the abandonment allegation, and hold that DCYF met its burden of proof. Because any of the statutory requirements may be proven to support the petition, § 15–7–7(a), we need not review the trial justice's findings regarding the other allegation. We discuss the trial justice's finding of abandonment below.

## 1

### Abandonment

 The respondent argues on appeal that DCYF did not prove by clear and convincing evidence that she abandoned her three children. DCYF may establish a prima facie case of abandonment by demonstrating " 'a lack of visits or contact with the child for the statutory six-month period.' " *In re Devone S.*, 777 A.2d 1268 (R.I.2001). It is the responsibility of the parent, not DCYF, to " 'substantially and repeatedly maintain contact with the children.' " *In re Shanelly C.*, 785 A.2d 1129, 1131 (R.I.2001). The respondent did not see her children between February 2003 and the date of the hearing—a fifteen-month period. Although respondent moved to New Jersey, she came back to

Rhode Island for part of that time and, while in Rhode Island, rarely saw any of her three children. The caseworker testified that respondent sent occasional letters or cards to the children, but that the content of some of those communications were deemed inappropriate and could not be passed on to the children. The respondent's relationship with her children included one six-month period without contact, followed by another five-month period with no contact. Dividing those two periods are a few letters and cards, with no phone calls or visits.

The respondent suggests on appeal that she was misled about her right to see her children. The respondent also argues that DCYF's censorship of her letters did not allow her to communicate with her children. We think it necessary to make clear that the respondent had not seen her children for the *fifteen months* prior to the hearing. Had the occasional letter not been censored, respondent's contact with her children would nonetheless remain extremely sporadic. The caseworker testified that one appropriate letter had been passed along, as well as a birthday card for each daughter and a picture for Aaron, who was not yet able to read. The respondent began writing to the children upon the encouragement of the caseworker, but six months passed between the last time she saw her children and the first letter. Five months passed between the last letter and the date of the termination hearing.

The respondent argues on appeal that her mental health issues and history of abuse should have caused the trial justice to examine whether this lack of contact with her children was, in fact, voluntary. Numerous attempts were made from the time of the family's first contact with DCYF to obtain services for respondent to address exactly those issues, but respondent was unwilling or unable to cooperate

with DCYF. It is our opinion that respondent's lack of cooperation with offered services in no way contradicts or excuses her abandonment of her children for more than the statutory six-month period. The trial justice did not err when he found that the abandonment allegation of the petition had been proven by clear and convincing evidence.

## Conclusion

We note in conclusion the long-held principle that the biological parent and child share a vital interest in preventing an erroneous termination of their relationship *until the state is able to prove parental unfitness. In re Kristina L.*, 520 A.2d 574, 579–80 (R.I.1987). Following such a determination, "the best interests of the child outweigh all other considerations." *In re Kristen B.*, 558 A.2d at 203. We agree that it is in the best interests of Ariel, Alicia, and Aaron, all three of whom have been bonded to loving foster homes, to be freed for adoption. For the above reasons, we affirm the decision of the trial justice. The record shall be remanded to the Family Court.