June 17, 2021

**Supreme Court**

| In re Manuel P. | : | No. 2019-452-Appeal. |
| | | (PTI 16-90) |
| | | |
| In re Angel P. | : | No. 2019-453-Appeal. |
| | | (PTI 16-91) |
| | | |
| In re Isaiah M. | : | No. 2019-454-Appeal. |
| | | (PTI 16-92) |
| | | |
| In re Victoria M. | : | No. 2019-455-Appeal. |
| | | (PTI 16-93) |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| In re Manuel P. | : | No. 2019-452-Appeal. |
| | | (PTI 16-90) |
| | | |
| In re Angel P. | : | No. 2019-453-Appeal. |
| | | (PTI 16-91) |
| | | |
| In re Isaiah M. | : | No. 2019-454-Appeal. |
| | | (PTI 16-92) |
| | | |
| In re Victoria M. | : | No. 2019-455-Appeal. |
| | | (PTI 16-93) |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** The respondent mother, Esmeralda M.,[1] appeals a Family Court decree, entered on September 16, 2019, terminating her parental rights to her four minor children, Manuel P., Angel P., Isaiah M., and Victoria M. (collectively the children), pursuant to G.L. 1956 §§ 15-7-7(a)(2)(vii) and 15-7-7(a)(3).

These consolidated appeals came before the Supreme Court for oral argument on March 4, 2021, pursuant to an order that directed the parties to show cause why

---

[1] To protect the identities of the children, in this opinion we will use the mother's first name and last initial only.

the issues raised in this appeal should not be summarily decided.  After hearing counsel's arguments, reviewing the record below, and carefully considering the memoranda submitted by the parties, this Court is satisfied that cause has not been shown.  Therefore, we will decide the appeals at this time.  For the reasons set forth below, we affirm the decree of the Family Court.

## Facts and Travel

At the time of trial, respondent was the mother of five children, four of whom are the subject of the current appeal.  Manuel was born on October 1, 2006; Angel on May 2, 2008; Isaiah on January 5, 2011; and Victoria on October 25, 2013.[2]  The Department of Children, Youth, and Families (DCYF or the department) became involved with this family on March 28, 2014, while respondent was hospitalized at Fatima Hospital.[3]  On April 29, 2014, DCYF filed *ex parte* neglect petitions against respondent in order to remove all four of her children.  Angel, Isaiah, and Victoria were placed with respondent's mother.  Manuel was placed with a foster family.[4]

---

[2] The respondent's rights to her youngest child, born just prior to the trial in this case, on March 25, 2018, are not at issue in this appeal.

[3] The respondent told a social worker that she was only hospitalized "because her mom made her" but reported to a clinician that she believed she had been suffering from postpartum depression.

[4] Manuel's separate placement was due to an allegation of inappropriate touching involving a family member.

Four service plans for each child were created by DCYF with regard to respondent over the next two years.[5] The first two sets of plans had reunification with mother as the primary goal. However, in the second set of plans, the concurrent plan goal shifted from guardianship to adoption for Manuel, Isaiah, and Victoria.

In March 2015, DCYF filed an emergency motion to remove the three youngest children from the custody of their maternal grandmother after the department learned that she had permitted an unsupervised visit with respondent. The children were placed in foster care. That same month, respondent was hospitalized again, for depression. The respondent told a social worker that she was court-ordered to take injections at that time.[6] DCYF reviewed with respondent the court's requirement that she continue her court-ordered mental-health treatment, also coordinating with the Providence Center regarding those services.

The respondent and her family were referred to the Families Together program, provided through the Providence Children's Museum, for supervised visitation and evaluation in April 2015. Also at this time, DCYF again asked that respondent complete a neuropsychological evaluation. While the third set of service

---

[5] The natural father of Manuel, Angel, and Isaiah, who is also named Manuel P., was named along with respondent as the subject of DCYF's termination of parental rights petitions; he consented to the children's adoption on December 3, 2018. Victoria's father is named Luis M., and he consented to her adoption on September 11, 2018.
[6] The record does not disclose what injections respondent was ordered to take, or by what court, as the caseworker testified that her notes showed only "monthly medication injections."

plans for the children—made in consultation with respondent—continued to state the goal as reunification, the concurrent plan goal for all four children became adoption.

Progress reviews on respondent's own mental-health services and efforts showed a lack of progress and emphasized the need to complete a neuropsychological evaluation and "engage FULLY in individual counseling [*sic*] and medication management[,]" as well as addressing her own experiences of abuse as a child. The respondent signed the third set of service plans for the three older children on January 4, 2016, but did not sign Victoria's, which listed reunification with the parents or principal caretakers, rather than the mother, as its goal.

In the months that followed, DCYF caseworkers noted respondent's lessening participation in visitation. Kimberly Marino, a DCYF social worker, testified that respondent set up the requested appointment for a neuropsychological evaluation in November 2015, with an agency that did not have an appointment until March 2016. In May 2016, respondent's visits with her children stopped, according to DCYF. The respondent's neuropsychological evaluation was completed on July 18, 2016. Even then, DCYF witnesses testified, respondent's inaccurate responses rendered the evaluation inadequate for the purposes of further service recommendations.

On May 26, 2016, DCYF filed petitions seeking to terminate respondent's parental rights with respect to the children. In its petitions, DCYF alleged two

grounds for the requested termination. First, DCYF alleged that the children had been in the legal custody or care of DCYF for at least twelve months, respondent was offered or received services to correct the situation which led to the children's placement, and there was not a substantial probability that they could return safely to respondent's care within a reasonable period of time. *See* § 15-7-7(a)(3).[7] Second,

---

[7] General Laws 1956 § 15-7-7 states, in pertinent part, as follows:

> "(a) The court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> "* * *
>
> "(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:
>
> "* * *
>
> "(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]
>
> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of

- 5 -

DCYF contended that respondent had exhibited behavior or conduct seriously detrimental to the children, for a duration rendering future care improbable. *See* § 15-7-7(a)(2)(vii). Nevertheless, DCYF's fourth and final set of service plans, unsigned by respondent, continued to state that the department's goal was reunification.

**Trial**

A first attempt at consolidated trial proceedings was held before a justice of the Family Court beginning in February 2018, during which respondent attempted to represent herself *pro se*. The trial justice determined that respondent was not competent to represent herself and that, as the justice later said, "it would be a travesty of justice to continue the matter" with her *pro se*, so the court "ceased the proceedings" until counsel could be appointed. The record before us contains transcripts for two pretrial hearings that occurred in September and October 2018. At both of these hearings the record reflects the presence of a guardian *ad litem* whom the Family Court appointed for respondent.

The respondent was absent from the October 29, 2018 pretrial hearing, and her attorney objected to proceeding without her. The matter was continued, and the trial commenced on November 13, 2018. While respondent was present at the first

time considering the child's age and the need for a permanent home[.]"

- 6 -

day of trial, she made comments that ranged from disparagement of the witness—for which she was reprimanded—to requesting a bathroom break.

DCYF's first witness was DCYF caseworker Chantele Rotolo, who had been assigned to the family in May 2014. According to Ms. Rotolo, "Mom * * * didn't trust my intentions and didn't want to sign anything[.]" Despite her "attempt[s] to service plan with mom[,]" Ms. Rotolo testified, respondent "didn't want to engage in the collaborative process that is needed for service planning." Ms. Rotolo recalled that respondent was already receiving services from the Providence Center related to mental health, which services were "part of the case planning for mother to achieve reunification[.]"

When trial resumed the next day, November 14, 2018, respondent was present in court at some point, although according to the trial justice she "left the vicinity" before testimony began. Consequently, her attorney objected to going forward without respondent present. However, the trial justice directed the parties to proceed with the next witness's testimony. Ms. Marino, the social caseworker assigned to the family at the time of trial, testified that she was assigned to the children in March 2015. Ms. Marino confirmed that respondent had been "referred to the Providence Center through Mental Health Court" and was also working with Community Care Alliance (CCA) while Manuel received therapy through the foster-care agency.

Ms. Marino testified that respondent's visits with the three younger children were "chaotic" and that visitation was later split up. Ms. Marino also testified that respondent resisted signing releases for services needed for the children and was uncooperative with referrals for services. After respondent was discharged from Families Together in April 2016, visitation occurred at DCYF but respondent "started to either not show up or to show up late[,]" in addition to other concerns, including those related to the chaotic nature of the visits.

The trial continued the following day, November 15, 2018. The respondent was not present in court, and her attorney again objected to going forward without her, reporting that respondent's mother had asserted to him that respondent's mental-health issues and hospitalization were the reasons for her absence. After reviewing the history and travel of the case, the trial justice stated as follows:

> "At this time, I am going to order that the matter continue to proceed. If counsel wants to sit down with his client at anytime and go over what questions may arise during these proceedings, if she appears before counsel, then counsel may. Counsel can freely ask for a transcript to share with his client regarding the days that we spent together. * * * It's her fundamental right to have a fair proceeding. With that, comes a privilege of having counsel, but if she won't take advantage of it, this Court is not going to let the children wait. So, we'll proceed."

Thus, DCYF proceeded with its case and called Jane Ahles, a supervisor with DCYF, who testified about respondent's referral to the Families Together program, as well as the multiple service referrals made for the children, including Head Start,

- 8 -

early intervention, and physical and occupational therapy for Victoria. According to Ms. Ahles, respondent had not had visitation with her children since May 2016, due to DCYF's successful motion to stop visitation, although respondent would come into her office frequently and make a scene, telling Ms. Ahles in October 2018 that she had been hospitalized at "Jane Brown."

On November 19, 2018, the trial justice held an *in camera* interview with Manuel, then twelve years old, stating on the record afterward that "Manuel was quite clear in stating that he does enjoy the family where he is presently placed and that he is desirous of becoming a permanent member of that family." The justice noted that Manuel expressed no interest in visitation with either his father or mother, instead favoring adoption. The respondent was again absent, and her attorney again objected to the trial going forward without her, noting that he had information that she was hospitalized at Rhode Island Hospital. The court denied the request for a continuance, promising to give her attorney ample opportunity to provide respondent with transcripts or to consult with her, as well as time for respondent to take the stand or present witnesses.

Crystal Nico then testified about her treatment of Manuel at Therapeutic Foster Care at CCA beginning in August 2014. Ms. Nico testified that Manuel had improved since being with his foster family, that he was happy and wanted to be

adopted, and that, in her expert opinion, it would be in his best interest for him to be adopted by that family.

The respondent was present at the fifth day of trial, on November 26, 2018, again interjecting and being reprimanded by the court. On that date, Christine Forsyth from Family Service of Rhode Island testified that both Angel and Isaiah had suffered from complex trauma as a result of neglect. After testifying about Victoria's health concerns and surgeries, Ms. Forsyth gave her expert opinion that both Victoria and Angel should together permanently stay with their current foster family.

On December 5, 2018, respondent was again present in court, making several inappropriate comments. After the Family Court appointed a new guardian *ad litem* for respondent,[8] the guardian *ad litem* requested evaluations or other information about respondent's condition, which the court instructed DCYF to provide.

On March 18, 2019, trial was set to resume when the attorney for DCYF reported respondent's commitment to Eleanor Slater Hospital to the court. According to DCYF, respondent had been committed in January 2019, under circumstances related to her arrest for simple assault on a police officer at the hospital, and the District Court had found her not competent to stand trial for the assault. The respondent's attorney renewed his ongoing objection to the court

---

[8] The previous guardian *ad litem* was no longer able to represent respondent.

proceeding without respondent, noting the absence of the new guardian *ad litem* and that respondent was presently committed. The trial justice decided that the case would move forward at the next court date, based on the civil nature of the proceeding and the fact that respondent had both competent counsel and a guardian *ad litem* representing her interests, as well as his determination that it was in the best interest of the children to continue.

The respondent was absent from court on April 30, 2019, and her attorney made a motion for continuance due to her continued institutionalization. The respondent's guardian *ad litem* advised the court that there was a medical report finding respondent not competent to stand trial, but the trial justice again decided to continue without respondent, given the presence of the guardian *ad litem* and counsel's ability to consult with respondent if necessary after each witness. The respondent's attorney noted his continuing objection. The respondent remained absent from the proceedings on May 16, 2019, when the trial reconvened, and her attorney renewed his motion for continuance due to her absence. The trial justice ordered that the trial would proceed and noted the objection.

Amber Massed from the Families Together program testified that visitation was provided weekly, at first with all four children, then split so that she could provide teaching and skill-building to respondent, who, according to Ms. Massed, "had a difficult time keeping track of all four of them." Overall, Ms. Massed

believed respondent made minimal progress. In April 2016, Ms. Massed had recommended that other permanency options be looked at for the children, giving her opinion, both at that time and again at trial, that the family could not be successfully reunited and recommending adoption.

After the conclusion of DCYF's case, respondent's attorney requested a continuance to the following week, so that he and the guardian *ad litem* could visit respondent, apprise her of the status, and consult with her about next steps. The trial justice granted the continuance, setting a control date for the following week. On July 25, 2019, two months after the close of DCYF's case, respondent rested without presenting any witnesses.

### The Family Court Decision

After hearing closing arguments on August 5, 2019, the trial justice delivered an oral pronouncement on September 3, 2019, terminating respondent's parental rights to all four children. Regarding respondent's absences during trial, the trial justice noted that she had been incapable of proceeding *pro se*, but that at all stages her appointed counsel and guardian *ad litem* were present.

The trial justice then found, by clear and convincing evidence, that the children had remained continuously in foster care for more than four years, and that DCYF had made reasonable efforts to reunify the family, creating four case plans that respondent had failed to complete. Additionally, the trial justice found that

respondent failed to plan for the return of her children or consistently engage in mental-health treatment, and that the children were bonded with their present foster homes and would be at risk for serious neglect if they were placed with respondent.

Consequently, the trial justice ruled that it was in the best interests of the children that respondent's parental rights be terminated, because the children were in DCYF custody for at least twelve months, respondent had been offered services to correct the situation which led to the children's placement, and there was not a substantial probability that the children could be returned safely to respondent's care. The trial justice also found that respondent had exhibited behaviors or conduct seriously detrimental to the children for a duration rendering her future care for the children improbable.

A decree terminating respondent's parental rights to the children was entered on September 16, 2019. The respondent filed a timely notice of appeal.

**Standard of Review**

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Rylee A.*, 233 A.3d 1040, 1051 (R.I. 2020) (quoting *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019)). "This interest 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate.'" *In re Indiana M.*, 230 A.3d 577, 583 (R.I. 2020) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)); *see Troxel v. Granville*,

530 U.S. 57, 65 (2000). However, this fundamental right of parents is "not absolute[,]" as "the rights of the parents are a counterpart of the responsibilities they have assumed." *In re Indiana M.*, 230 A.3d at 586 (second quote quoting *Lehr v. Robertson*, 463 U.S. 248, 257 (1983)). Nevertheless, this Court has consistently held that, "[g]iven the drastic and irreversible nature of a termination of parental rights decree, 'the right to due process requires that the state support its allegations by clear and convincing evidence.'" *In re Rylee A.*, 233 A.3d at 1051 (quoting *In re Violet G.*, 212 A.3d at 166).

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Rylee A.*, 233 A.3d at 1049 (quoting *In re Violet G.*, 212 A.3d at 166). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Violet G.*, 212 A.3d at 166).

**Discussion**

Before this Court, respondent argues that the trial justice erred in terminating her parental rights, specifically claiming that the trial justice violated her right to procedural due process by proceeding with trial in her absence, following a declaration by another court that respondent was incompetent to stand trial. The

- 14 -

respondent also contends that DCYF failed to establish that it made reasonable efforts to strengthen the parental bond and offer services aimed at reunification, as the department is required to do under §§ 15-7-7(a)(3) and 15-7-7(b)(1).[9]

## Due Process

The respondent argues that the determination by the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals (BHDDH)[10] that respondent could not participate or assist in her District Court criminal assault trial rendered the Family Court trial justice's reassurance that the court would make time for counsel to consult with her ineffective to preserve her due process rights. The respondent also raises as instructive the statutory standard for competency in criminal proceedings in G.L. 1956 § 40.1-5.3-3. We do not agree.

As an initial matter, the statute proffered by respondent, § 40.1-5.3-3, is inapposite here, as it applies solely in criminal proceedings. *See In re Tavares*, 885 A.2d 139, 147 (R.I. 2005) (discussing § 40.1-5.3-3). The termination of parental rights is a civil proceeding. *See, e.g.*, *In re Destiny D.*, 922 A.2d 168, 173 (R.I. 2007).

---

[9] The respondent does not contest that the children have been in the legal custody or care of DCYF for at least twelve months, as required when the department proceeds under § 15-7-7(a)(3).

[10] The "determination by BHDDH" referenced in respondent's filing with this Court seems to refer to a conversation that the DCYF attorney reported having with legal counsel at BHDDH, during which the BHDDH attorney "indicated to me that mother – she thought it was that mom would not be competent to stand trial in either venue based on her commitment to Eleanor Slater."

- 15 -

Due process, in the context of such a civil proceeding, "requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Indiana M.*, 230 A.3d at 584 (quoting *Izzo v. Victor Realty*, 132 A.3d 680, 688 (R.I. 2016)). This Court has "previously * * * acknowledged that parents have 'no absolute right to be physically present at the termination hearing.'" *In re Joziah B.*, 207 A.3d 451, 456 (R.I. 2019) (quoting *In re Ariel N.*, 892 A.2d 80, 84 (R.I. 2006)). However, notwithstanding the civil nature of these proceedings, "the termination of parental rights is a significant event in which a parent's due process rights reasonably should be protected." *Id.* at 457 (quoting *In re Ariel N.*, 892 A.2d at 84).

Previously, this Court has expressed its concern where natural parents are absent from a hearing on a petition for the termination of their parental rights, holding that, "[a]t a minimum, a Family Court justice should inquire about the status or position of the parent and the reason for [the parent's] absence to ascertain whether the non-appearance was voluntary or non-voluntary." *In re Ginger G.*, 775 A.2d 255, 258-59 (R.I. 2001) (vacating a decree terminating the parental rights of a *pro se* respondent who failed to appear where no attorney or guardian *ad litem* represented her interests).

However, we have also stated that where a parent is represented by counsel who participates in the proceedings on their behalf, there is no necessity to determine

whether the parent's absence is voluntary. *See In re Ariel N.*, 892 A.2d at 84-85; *see also In re Brandon A.*, 769 A.2d 586, 589 (R.I. 2001) (holding that representation by counsel is an alternative to the parent's presence in court). Furthermore, where a guardian *ad litem* appointed to represent the parent participates, this Court has long held that the procedural requirements of due process were satisfied. *See, e.g.*, *In re John P.*, 458 A.2d 1085, 1085-86 (R.I. 1983).

While valid, respondent's concerns about the ability of her attorney to reasonably consult with her regarding her case while she was institutionalized and deemed incompetent were sufficiently addressed by the court's continued efforts to ensure that she also had a guardian *ad litem* appointed and present in court.[11] Moreover, the representation of respondent by her attorney was eminently professional, as evidenced by his cross-examination of the DCYF witnesses, during which he elicited positive information about respondent's desire for a relationship with her children and even cast some doubt on the value of certain negative testimony.

We are satisfied that the trial justice adequately protected respondent's due process rights by ensuring that she was represented at all times, including the

---

[11] Additionally, the court did not meet with respect to respondent's case from March 19 until April 30, 2019, giving her attorney and new guardian *ad litem* ample time to consult with her.

additional protection of a guardian *ad litem*, while properly seeking a resolution in the best interests of the children.

## Reasonable Efforts to Reunify

The respondent argues that the trial justice erred in finding that DCYF offered services reasonably designed to correct respondent's mental-health needs or reviewed or coordinated these services. The respondent also contends that DCYF required that she maintain treatment and medication but made no showing that she failed to do so. Additionally, respondent points out that, while she was referred for a neuropsychological evaluation, DCYF did not wait for the results before filing its petitions to terminate her parental rights.

"In order for the Family Court to terminate a parent's rights under § 15-7-7(a)(2)(vii), it is incumbent upon DCYF to establish, by clear and convincing evidence, that it employed 'reasonable efforts' to 'encourage and strengthen the parental relationship.'" *In re Briann A.T.*, 146 A.3d 866, 873 (R.I. 2016) (quoting § 15-7-7(b)(1)). DCYF must also "establish by clear and convincing evidence that it 'offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care.'" *Id.* (quoting *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013)).

This Court has never required a demonstration by DCYF that it undertook "extraordinary efforts"—indeed, the legal requirement under the statute is simply

"reasonable efforts" on the part of DCYF, and "the reasonableness of such efforts 'must be determined from the particular facts and circumstances of each case.'" *In re Briann A.T.*, 146 A.3d at 873 (quoting *In re Joseph S.*, 788 A.2d 475, 478 (R.I. 2002)).

After a thorough review of the record, it is clear that DCYF met its statutory obligation to respondent by discharging reasonable efforts to reunify her with her children. The trial justice made extensive findings regarding these efforts, which included four sets of service plans for the children, continuous efforts to provide meaningful visitation, ongoing attempts to engage respondent in the process of planning for reunification, and numerous referrals for services. Our examination of the record shows substantial evidentiary support for the trial justice's findings. *See In re Natalya C.*, 946 A.2d 198, 203 (R.I. 2008) ("[W]e do not fault the agency when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification.").

Therefore, we conclude that the trial justice did not err when he found by clear and convincing evidence that DCYF made reasonable efforts to address the underlying issues that led to the termination of respondent's parental rights.

### The Best Interests of the Children

In the final analysis, this Court must always evaluate whether the decision of the Family Court advanced the best interests of the children. "Every child has a right

- 19 -

to reasonable care and maintenance; to be free from abuse or neglect, with the hope of spending the remainder of [their] childhood in a family setting in which the child may grow and thrive." *In re Amiah P.*, 54 A.3d 446, 454 (R.I. 2012). This Court has also held that "[c]hildren are entitled to permanency[.]" *Id.* (quoting *In re Shawn M.*, 898 A.2d 102, 108 (R.I. 2006)).

Although this Court is ever "mindful of the 'significance of severing the bond between parent and child,' we are satisfied that the evidence presented in this case supported the termination of the respondent's parental rights." *In re Violet G.*, 212 A.3d at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009)). Testimony was given at the trial that the children were working to move past the trauma of their early years and establishing stability with their respective foster families. Based on this testimony, the trial justice found that that the children were bonded with their foster homes and would be at risk for serious neglect if they were placed with respondent.

Consequently, our careful review of the record satisfies any concern raised as to propriety of the trial justice's findings. Accordingly, we will not disturb the trial justice's finding that termination of the respondent's parental rights was in the best interests of these children.

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights with respect to Manuel P., Angel P., Isaiah M., and Victoria M.  The papers may be remanded to the Family Court.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | In re Manuel P.<br>In re Angel P.<br>In re Isaiah M<br>In re Victoria M. |
| **Case Number** | No. 2019-452-Appeal.<br>(PTI 16-90)<br>No. 2019-453-Appeal.<br>(PTI 16-91)<br>No. 2019-454-Appeal.<br>(PTI 16-92)<br>No. 2019-455-Appeal.<br>(PTI 16-93) |
| **Date Opinion Filed** | June 17, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Rossie Lee Harris, Jr. |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth and Families<br><br>Shilpa Naik<br>Court Appointed Special Advocate |
| | For Respondent:<br><br>Kara Hoopis Manosh, Esq. |