**Supreme Court**

No. 2015-170-Appeal.
(98-1873-3)
No. 2016-233-Appeal.
(98-1873-5)

In re Briann A.T. et al.    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2015-170-Appeal.
(98-1873-3)
No. 2016-233-Appeal.
(98-1873-5)

In re Briann A.T. et al.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on October 4, 2016, on appeal by the respondent, Marvin T.[1] (respondent), from a Family Court decree terminating his parental rights to his daughters, Briann A.T. (Briann) and Bri'Nayshia A.T. (Bri'Nayshia), who were born on October 3, 2007, and November 17, 2010, respectively. The parties were directed to appear and show cause why the issues raised in this appeal should not be summarily decided.[2]   After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### Facts and Travel

The plight of Briann and Bri'Nayshia first came to the attention of the Department of Children, Youth, and Families (DCYF) on August 23, 2012, when DCYF was called to the home

---

[1]  For the sake of privacy, the family members will be referred to by only their first names.

[2]  The appeals in respect to respondent's parental rights of Briann and Bri'Nayshia were consolidated for oral argument by order of this Court entered on August 18, 2016.

of Briann and Bri'Nayshia's mother in response to an incident that led to the mother's arrest. DCYF removed Briann and Bri'Nayshia from the home, placed them on a forty-eight-hour hold, and filed ex parte neglect petitions in the Family Court seeking to remove the children from the care of the mother and respondent-father. During this time, the whereabouts of respondent were unknown.

A decree was entered by the Family Court on January 17, 2013, finding Briann and Bri'Nayshia to be neglected and committing them to the care, custody, and control of DCYF. On October 27, 2014, DCYF filed petitions in the Family Court seeking to terminate the parental rights of respondent with respect to both Briann and Bri'Nayshia.[3] With respect to respondent, DCYF alleged the following grounds for termination: that the children had been placed in DCYF's custody or care for at least twelve months; that respondent was "offered or received services to correct the situation which led to the [children] being placed"; and that there was not "a substantial probability that the [children would] be able to return safely to [respondent's] care within a reasonable period of time considering the [children's] age[s] and [their] need for a permanent home."  G.L. 1956 § 15-7-7(a)(3).[4]  The respondent contested the petitions and proceeded to trial.

---

[3] DCYF filed corresponding petitions in the Family Court seeking to terminate the parental rights of Briann and Bri'Nayshia's mother.  The mother voluntarily consented to the termination of her parental rights and agreed to the open adoption of each child.

[4] General Laws 1956 § 15-7-7(a)(3) sets forth in pertinent part:

> "(a) The court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> " * * *
>
> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least

Trial proceedings were held in Family Court on March 16-18 and April 1, 2015. The Family Court justice heard testimony from several witnesses, including Jen Shymanik (Shymanik), a social worker from DCYF, who was assigned to respondent's case on February 1, 2013. At that time, Shymanik contacted respondent and thus began what can only be characterized as difficult and unsuccessful case planning for a recalcitrant father with mental-health issues.

The record discloses that eight case plans had been developed, four for each child. Those case plans included the attainable goals of: obtaining employment, obtaining appropriate housing, gaining financial stability, attending to the girls' mental-health and developmental needs, and working on parenting through visitation, empathy, and bonding. Shymanik also referred respondent to a psychologist for a parent-child evaluation; however, respondent refused to attend. It was only after Shymanik stressed the importance of the evaluation that in July 2013, respondent agreed to cooperate. The evaluation centered on respondent's lack of parenting skills and his own mental-health issues. Although the evaluation included a referral for respondent to attend the Families Together program at the Providence Children's Museum, respondent was ineligible based on his failure to consistently attend his biweekly visits with Briann and Bri'Nayshia. Visitation was problematic throughout case planning efforts. The respondent canceled many scheduled visits with his daughters, asserting that he was ill, he had to work, or that the weather was inclement.

twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

Shymanik estimated that, during her involvement with respondent, he was offered visitation twice a month but that he attended only one visit per month. Shymanik testified that during these visits the girls were "[r]eally affectionate with one another" but there "seemed to be very little bond between [respondent] and the girls. * * * [T]hey weren't very responsive to him." Shymanik credited respondent for asking questions about Briann and Bri'Nayshia's day and stressing the importance of education, but she noted that, in some ways, respondent "showed very limited capacity to parent." For instance, after Shymanik informed respondent that a nephrologist had diagnosed Briann with hypertension and recommended that she not consume high-fat, sugary, or fried foods, respondent brought fried chicken and french fries for her to eat. Although Shymanik provided respondent with feedback and suggestions for improvement, respondent "consistently ignored" her and on several occasions "became sort of argumentative."

Shymanik testified that, on one occasion, respondent became confrontational when he arrived for a visit and was informed that Briann would be approximately half an hour late because she was attending a friend's birthday party. Shymanik recalled, "[respondent] * * * had a verbal argument with the clinician and just walked out of the visit." Thereafter, respondent "refused" to participate in the Families Together program, but visitations continued. Shymanik observed an increase in Bri'Nayshia's behavioral issues; and, when she brought the problem to respondent's attention, he "blame[d] [Shymanik] and the foster parents for the way the children behaved." When Shymanik explained to respondent that he should be more protective of the children because of their developmental and mental-health needs, he replied that the children "didn't have any service needs at all" and that their behavior arose from lenient parenting by the foster parents. Shymanik informed respondent that his daughters had been diagnosed with communication, behavioral, and medical needs and that Briann and Bri'Nayshia had been

referred to early-intervention services and enhanced outpatient services. These services were delayed, however, because respondent flatly refused to sign the necessary release forms; requiring DCYF to seek the Family Court's permission for Briann and Bri'Nayshia to receive these overdue services.

In December 2013, Shymanik referred respondent to the Newport County Mental Health Services for a psychiatric evaluation. During the evaluation, respondent took no responsibility for any missed visits and informed the evaluator that he was "doing everything he could" but that DCYF "didn't want * * * him to have his kids."

With regard to future planning for Briann and Bri'Nayshia, respondent was informed that he needed to ensure that the children would not be exposed to unsafe living conditions. Although respondent admitted his residence "wasn't an appropriate place" for Briann and Bri'Nayshia, he made no effort to obtain suitable housing. Shymanik testified that, while respondent met certain goals in the case plans such as obtaining employment, his mental-health issues, especially his "combative approach" to disciplining, were continuous concerns. In addition to being concerned about his mental-health, Shymanik testified to her repeated concerns that respondent's future planning for Briann and Bri'Nayshia included his stated intention to "hand the children over to his sister for her to parent them."

In June 2014, Shymanik and her supervisor met with respondent to discuss the remaining services that were prerequisites to reunification with Briann and Bri'Nayshia. The services included parenting services and consecutive attendance at Briann and Bri'Nayshia's medical appointments. Shymanik explained to respondent that, if the services were not completed, DCYF would file a petition to terminate his parental rights. The respondent replied, "do what you have to do."

Meanwhile, Briann and Bri'Nayshia's foster families were "very attentive" to their needs. Shymanik reported that Briann was "very connected" to her foster mother and called her "mommy." Likewise, Bri'Nayshia referred to her foster parents as "mommy" and "daddy." Bri'Nayshia "hugs them, kisses them, [and] lays her head on their shoulder." Both foster families expressed a desire to adopt the children.

At the conclusion of Shymanik's testimony, three additional witnesses with personal knowledge of respondent's character testified about their numerous concerns regarding respondent's ability to parent. For example, Kimberly Rodrigues (Rodrigues), a former family clinician at Families Together, testified that, in her opinion, reunification "was a risk" for these children. Rodrigues recounted the visitation at which respondent became angry when he was informed that Briann would be approximately half an hour late because she was attending a friend's birthday party. Rodrigues testified that respondent blamed Shymanik for Briann's tardiness and stated: "I come from a street background, [and] this makes me want to take matters into my own hands. It wouldn't turn out good for some people. When I'm provoked, I can be the nastiest person on this earth, and [Shymanik] crossed the line."

On April 24, 2015, the Family Court justice issued a written decision granting the petition to terminate respondent's parental rights in accordance with §§ 15-7-7(a)(2)(vii) and 15-7-7(a)(3). In her decision, the Family Court justice found by clear and convincing evidence that respondent was an unfit parent because he was, inter alia, "hostile, argumentative, agitated and even threatened physical harm when he did not 'get his way,'" and that he "failed to address his parenting issues." In addition, the Family Court justice found that DCYF had fulfilled its obligation to make reasonable efforts to reunify respondent with his daughters in accordance with § 15-7-7(b)(1), but that respondent's efforts at reunification were "marginal at best." She

- 6 -

concluded that the evidence "overwhelmingly prove[d]" that respondent failed to cooperate with the numerous case plans and services offered by DCYF and that it would be in the best interests of Briann and Bri'Nayshia that they be adopted by their foster parents. A decree was entered on May 4, 2015, from which respondent has appealed to this Court.[5]

**Standard of Review**

"On appeal, '[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence.'" In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). "These findings are entitled to great weight, and this Court will not disturb them unless they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.'" Id. (quoting In re Victoria L., 950 A.2d at 1174).

"Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Amiah P., 54 A.3d at 451 (quoting In re Destiny D., 922 A.2d 168, 172 (R.I. 2007)). "Before terminating a parent's rights to his or her child, the trial justice must find that the parent is unfit." Id. (citing In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009)). "In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence." Id. (citing In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011)). "However, once the trial justice determines parental unfitness, 'the best interests of the child outweigh all other considerations.'" Id. (quoting In re Jazlyn P., 31 A.3d at 1279).

---

[5] The respondent prematurely filed notices of appeal on April 29, 2015. This Court, however, will treat the premature notices of appeal as if they had been timely filed after the judgment was entered. See Russell v. Kalian, 414 A.2d 462, 464 (R.I. 1980) (citing Beauvais v. Notre Dame Hospital, 120 R.I. 271, 387 A.2d 689 (1978)).

**Analysis**

Before this Court, respondent argues that the Family Court justice erred in terminating his parental rights, specifically claiming that the state failed to prove by clear and convincing evidence that he was an unfit parent. In addition, respondent avers that the state failed to establish that it made reasonable efforts to strengthen the parental bond and offer services aimed at reunification, pursuant to §§ 15-7-7(a)(3) and 15-7-7(b)(1).[6]

When confronted with assertions such as these, our review of the Family Court's decision is threefold. "We turn first to the court's finding of parental unfitness; thereafter, we examine its finding as to the reasonable reunification efforts on the part of DCYF. Finally, our review turns to the Family Court's determination concerning the children's best interests." In re Brooklyn M., 933 A.2d 1113, 1122 (R.I. 2007).

**Parental Fitness**

Our careful evaluation of the finding of unfitness made by the Family Court justice, in the face of this evidence, is not one with which we struggle. Pursuant to § 15-7-7(a)(2)(vii), a parent is deemed unfit where the parent "exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]" A finding of parental unfitness under § 15-7-7(a)(2) made by a trial justice is "entitled to great weight and will not be disturbed on appeal unless [it is] clearly wrong or the trial justice misconceived or overlooked material evidence." In re Jennifer R., 667 A.2d 535, 536 (R.I. 1995).

The Family Court justice premised her finding of unfitness on respondent's refusal to cooperate with DCYF, his sporadic visits, and the unanimous consensus among DCYF service

---

[6] The respondent does not contest that Briann and Bri'Nayshia have been in the legal custody or care of DCYF for at least twelve months, pursuant to § 15-7-7(a)(3).

providers that he is "agitated," "angry," and "threaten[s] physical harm when he [does] not 'get his way,'" such that reunification with his children presents a risk to their well-being. The Family Court justice determined that this behavior and conduct "overwhelming[ly]" established that respondent was unfit to parent Briann and Bri'Nayshia. A thorough review of the record before us supports these findings—particularly the testimony of Shymanik. Although Shymanik testified to respondent's occasional successes, such as obtaining employment, the majority of her testimony highlighted respondent's noncompliance with case planning, his defiant refusal to sign medical releases, violent outbursts, frequent anger, and poor interactions with Briann and Bri'Nayshia. Shymanik's testimony concerning respondent's mental-health issues and his refusal to accept the mental-health services offered to him demonstrates his unfitness. See In re Ryan S., 728 A.2d 454, 457 (R.I. 1999) (mother's mental-health problems and her unwillingness to cooperate with recommended services rendered her unfit to parent her son). Shymanik's testimony was accompanied by significant corroborating evidence establishing that respondent is unfit. See In re Charles L., 6 A.3d 1089, 1093 (R.I. 2010) (affirming the trial justice's determination of unfitness where parent demonstrated "periods of noncompliance" with treatment plan, "marked by violent outbursts, sudden mood changes, and unpredictable actions and demands").

The respondent's own statements also belie the notion that he was willing to parent Briann and Bri'Nayshia; perhaps none more than his admission that he would "hand the children over to his sister for her to parent them." This declaration aptly illustrates respondent's unwillingness to parent these children and explains their lack of responsiveness to him. We are therefore satisfied that the Family Court justice's findings with respect to this issue were not clearly erroneous and were supported by clear and convincing evidence.

**Reasonable Efforts**

In order for the Family Court to terminate a parent's rights under § 15-7-7 (a)(2)(vii), it is incumbent upon DCYF to establish, by clear and convincing evidence, that it employed "reasonable efforts" to "encourage and strengthen the parental relationship." Section 15-7-7(b)(1). In addition, pursuant to § 15-7-7(a)(3), DCYF must establish by clear and convincing evidence that it "offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care." In re Lauren B., 78 A.3d 752, 760 (R.I. 2013) (citing In re Christopher B., 823 A.2d 301, 315 (R.I. 2003)). Under no circumstance have we enlarged these requirements to a point where DCYF need demonstrate that it took "extraordinary efforts." Id. (quoting In re Jose Luis R.H., 968 A.2d 875, 882 (R.I. 2009)). Rather, the law requires that DCYF employ "reasonable efforts," and the reasonableness of such efforts "must be determined from the 'particular facts and circumstances of each case.'" In re Joseph S., 788 A.2d 475, 478 (R.I. 2002) (quoting In re Kristen B., 558 A.2d 200, 203 (R.I. 1989)).

After reviewing the record, it is clear to us that DCYF complied with its statutory obligation to make reasonable efforts to reunify respondent with Briann and Bri'Nayshia. The failure in this case rests squarely upon respondent. The Family Court justice found that DCYF "made extraordinary efforts" to consult and plan with respondent, including: creating four case plans for each child, making suitable arrangements for visitation, and endeavoring to increase the number of visits. DCYF also made numerous referrals for various and badly needed family services, including parenting skills and mental-health counseling. See In re Jose Luis R.H., 968 A.2d at 882 (finding that "reasonable efforts" include making "suitable arrangements for visitation" and providing appropriate services to the family (quoting In re Nathan F., 762 A.2d

1193, 1195 (R.I. 2000))). The respondent, however, failed to comply with DCYF's recommendations, declined to follow through with any mental-health counseling, and refused to cooperate with DCYF's case plans. See In re Michael F., 665 A.2d 880, 882 (R.I. 1995) (concluding that a parent's "unwillingness to accept help clearly places [the child] at risk of emotional and physical harm"). The Family Court justice concluded that, despite respondent's "attitude and lack of cooperation," DCYF persevered in its attempts to work with him for more than two years. Nonetheless, respondent's efforts were "marginal at best." See In Raymond C., 864 A.2d 629, 634 (R.I. 2005) ("[P]arents must not only maintain contact with the child and plan for the child's future return but also 'perform some minimal act toward the fulfillment of that plan.'" (quoting In re Kristen B., 558 A.2d at 204)).

Our review of the record reveals that there is adequate evidentiary support for the Family Court justice's careful and detailed conclusions. The respondent, however, categorizes these findings as "vague[] articulat[ions]" and suggests that the record reveals that any conduct unbecoming to a parent that he may have displayed is directly attributable to DCYF's failure to provide him with individualized treatment. To this argument we echo our sentiments in In re Natalya C., 946 A.2d 198 (R.I. 2008), in that "we do not fault the agency when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification." Id. at 203 (citing In re Raymond C., 864 A.2d at 633). During two precious years of his daughters' childhood, respondent failed to obtain safe and adequate housing or otherwise plan for their future. His sporadic efforts, refusal to cooperate with DCYF, and failure to nurture a loving relationship with his children lead us to conclude that respondent is simply unequipped to parent them.

We have long recognized that, in carrying out its responsibilities for child welfare, DCYF need not be burdened with "holding the hand of a recalcitrant parent." In re Joseph S., 788 A.2d at 478 (quoting In re Kristen B., 558 A.2d at 204). We therefore conclude that the Family Court justice did not err when she found by clear and convincing evidence that DCYF made reasonable efforts to correct the situation that led to the removal of Briann and Bri'Nayshia from respondent's care.

## The Best Interests of the Children

Once DCYF has "demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the Family Court then shifts its analysis to consider the best interests of the child or children involved in the proceeding." In re Brooklyn M., 933 A.2d at 1126 (citing In re Kristina L., 520 A.2d 574, 580 (R.I. 1987)). The best interests of the child or children "outweigh all other considerations." Id.

The Family Court justice concluded that it was "clearly in the best interest of [Briann and Bri'Nayshia] that they be adopted by their foster families." See In re Shanelly C., 785 A.2d 1129, 1132 (R.I. 2001) ("We cannot disregard the bond [the child] has formed with loving foster parents in a pre-adoptive home."). Although we remain mindful of the "significance of severing the bond between parent and child," we are satisfied that the evidence presented in this case supported the termination of the respondent's parental rights. In re Alexis L., 972 A.2d 159, 170 (R.I. 2009) ("[T]his Court is ever cognizant of the significance of severing the bond between parent and child [; however,] it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow.").

**Conclusion**

For these reasons, the respondent's appeal is denied and dismissed. The decree of the Family Court terminating the parental rights of the respondent is affirmed.  The papers of this case are remanded to the Family Court.



**R**HODE **I**SLAND **S**UPREME **C**OURT **C**LERK'S **O**FFICE

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     In re Briann A.T. et al.

**CASE NO:**     No. 2015-170-Appeal.
(98-1873-3)
No. 2016-233-Appeal.
(98-1873-5)

**COURT:**     Supreme Court

**DATE OPINION FILED:**   October 18, 2016

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**     Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice  Laureen D'Ambra

**ATTORNEYS ON APPEAL:**

For Petitioner:  Karen A. Clark
Department of Children Youth and Families

Lynne Marran Radiches
Court Appointed Special Advocate

For Respondent:  Jesse W. Duarte, Esq.