June 17, 2025

**Supreme Court**

In re N.O.                    :          No. 2023-224-Appeal.
                                         (PJ 22-2677)

In re K.O.                    :          No. 2023-226-Appeal.
                                         (PJ 22-2678)

                                         (Dissent begins on Page 21)

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| In re N.O. | : | No. 2023-224-Appeal. |
|---|---|---|
| | | (PJ 22-2677) |
| | | |
| In re K.O. | : | No. 2023-226-Appeal. |
| | | (PJ 22-2678) |
| | | |
| | | (Dissent begins on Page 21) |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.** The respondent, Matthew O., appeals from decrees of the Family Court terminating his parental rights with respect to his two sons (N.O. and K.O.).[1] On appeal, he contends that the trial justice erred in finding that the Department of Children, Youth, and Families (DCYF) made reasonable efforts to reunite him and his children. These consolidated appeals came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in these appeals should not be summarily decided. After considering the parties' written and oral submissions and after carefully reviewing the record, we conclude that cause has not been shown and that these

---

[1] The Court will refer to the respondent by first name and last initial to protect the identities of the children. No disrespect is intended.

- 1 -

appeals may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decrees of the Family Court.

**Facts and Travel**

Matthew and the mother of the children first became involved with DCYF in October of 2017 due to the mother's use of drugs while caring for N.O., whose date of birth is June 6, 2016. On February 5, 2018, DCYF filed a petition alleging neglect and seeking the commitment of N.O. to the care, custody, and control of DCYF. N.O. was initially placed in the home of his maternal grandmother. However, shortly thereafter, he was moved to a nonrelative foster home, where he currently resides. K.O., the brother of N.O., was born on June 17, 2018. At the time of his birth, K.O. was removed from the care of his parents and was placed in the same foster home as N.O. K.O. has been diagnosed with a developmental disability known as PADDAS syndrome[2] and, therefore, requires specialized care.[3]

---

[2] PADDAS syndrome, or PUM1-associated developmental disability-ataxia-seizure syndrome, is "[a] rare genetic syndromic intellectual disability characterized by developmental delay, intellectual disability, ataxia, and, more variably, seizures and short stature. Behavioral abnormalities may also be observed * * *." *PUM1-Associated Developmental Disability-Ataxia-Seizure Syndrome*, Orphanet, https://www.orpha.net/en/disease/detail/589515 (last visited May 27, 2025).

[3] K.O.'s symptoms are not described in detail in the record; however, the trial justice found that it was clearly established that he suffers from a disability that will require "lifelong care" including "numerous services" and various medical appointments. This finding is not contested on appeal.

In April of 2019, the mother of N.O. and K.O. consented to an open adoption. Matthew, however, had been working with DCYF towards reunification since April 3, 2018, and decided to continue pursuing reunification on his own. Nonetheless, on October 30, 2019, DCYF filed a petition to terminate Matthew's parental rights, pursuant to G.L. 1956 § 15-7-7. This initial termination petition was denied after a trial based on the trial justice's finding that DCYF had failed to make reasonable efforts to reunify Matthew with his children.

Subsequently, on June 17, 2022, DCYF filed a second petition in the Family Court to terminate the parental rights of Matthew on the grounds that (1) the children had been in the legal care and custody of DCYF for at least twelve months; (2) Matthew had received services to support reunification; and (3) there was not a substantial probability that the children would be able to return to their father's care within a reasonable amount of time relative to the children's ages and need for permanency.

A trial took place in the Family Court between January 10 and March 21, 2023. DCYF called Matthew as its first witness.[4] He testified that, while he did not fully understand DCYF's concerns with him at the time of the children's removal, he recalled having been advised that he needed to learn co-parenting and

_____

[4] The respondent was later called as a witness by his counsel as well; his testimony on both occasions was substantially the same.

multitasking skills and also that he needed to end his relationship with the children's mother. He further recalled that, when he became aware of the mother's inability to maintain clean drug screens, he decided to pursue reunification on his own.

Next, Matthew testified as to his mental health struggles, detailing his history with substance use, anxiety, and attention-deficit/hyperactivity disorder (ADHD). He noted that, over the course of the reunification process, he had seen a psychiatrist and a mental health counselor and had been medically prescribed various drugs including Adderall, Ativan, Ambien, Klonopin, and Xanax. Matthew further stated that, as of the time of trial, he had been under the care of a psychiatrist (he was no longer seeing the mental health counselor) and was taking Klonopin and Adderall under his psychiatrist's supervision. He further stated that he was continuing to attend Alcoholics Anonymous and that he had maintained sobriety since June of 2018.

Following the denial of the first petition for termination of parental rights, Matthew received two separate case plans from DCYF, each with the goal of reunification. The case plans included a referral for parenting classes at the Groden Center and mental health treatment. Matthew testified that he decided to seek mental health treatment on his own, in addition to his participation at the Groden Center. However, he explained that he was discharged from the Groden Center prior to the

completion of the program, due to his frequently being tardy for visitation with his children.

Matthew also testified that his fiancée had recently experienced "medical issues" which resulted in her being placed in a nursing home. He stated that he cared for his fiancée and that it was his practice to visit her in the nursing home every day. Finally, Matthew explained that he was not interested in an open adoption because he believed that he would be "signing [his children] away" and he instead hoped that his sons could come and live with him.

DCYF then called Laura Torres. Ms. Torres is a DCYF social worker who was assigned to this case in August of 2020. Ms. Torres testified that she learned that the two boys had initially been removed from the mother and Matthew's care due to the mother's substance abuse. She further testified that, by August of 2020, Matthew had already addressed his gambling and substance-abuse issues, and his case plan was focused on "a service for parenting and visitation and also mental health counseling * * *."

Ms. Torres testified that she referred Matthew to the Groden Center for parenting classes. She explained that Matthew had initially requested that he be referred to the Boys Town Commonsense Parenting Class, but that they eventually agreed the Groden Center would be a "better fit for his needs." Ms. Torres also noted that Matthew agreed to mental health counseling but wanted to find his own

provider, and that Matthew did sign a release allowing her to speak with his psychiatrist.

Ms. Torres testified that Matthew's visitation plan included supervised visits once a week for two hours. She stated that Matthew requested that his visitations increase so that he could get "back into the swing of being more of a full time type of parent * * *." Ms. Torres further recalled that she "[spoke] to [Matthew] about attending some of the children's appointments" and that "[h]e attended a couple of them." However, she testified that Matthew began "struggling more" with his ability to work towards reunification after his fiancée unfortunately suffered complications from a scheduled surgery in November of 2021 and was placed in a nursing home. Ms. Torres explained that, following this incident, Matthew was "trying really hard to balance visiting [his fiancée] in the nursing home and the other tasks that he needed to do in caring for himself and visiting with the kids."

Ms. Torres testified that Matthew had asked for suggestions as to how he might improve his visits with the children, but that she had concerns about his ability to act and make decisions independently; she explained that this was particularly troubling due to K.O.'s special needs combined with the possibility that Matthew would be parenting alone. Ms. Torres noted that Matthew had issues with time management and would often arrive late to scheduled visitations. She recalled speaking to Matthew about her concerns regarding his tardiness and explaining that

time management would be more difficult if he were caring for the children on a full-time basis.

Ms. Torres testified that Matthew explained that he was sometimes late because he was engaging in behaviors such as packing and repacking items that he would bring to the visitations. She stated that, in her opinion, such behaviors were indicative of obsessive-compulsive disorder (OCD). She also noted that she told Matthew he should speak with his clinician about this issue. Ms. Torres further testified that, when Matthew signed a release allowing her to communicate with his clinician, the clinician told her that he had difficulty treating Matthew due to missed appointments.

Ms. Torres stated that, overall, she saw some positive behavioral changes in Matthew from the time when his case opened until the time of trial. She testified that Matthew "was very fun with the kids" and that it was "obvious that he loves [his children] very much." She found that Matthew showed a willingness to comply with simple requests and that he was "a pleasure to work with." She also noted that, although Matthew has had difficulties with tardiness, he was communicative and he "never no showed."[5] Ms. Torres added that Matthew's relationship with his fiancée had been a factor in favor of reunification before her unfortunate medical problems.

---

[5] The record reveals that Matthew has missed visitations with the children due to his tardiness but there is nothing in the record indicating that he ever completely failed to show for a visitation.

However, it was Ms. Torres' testimony that it would be in the best interest of N.O. and K.O. to be adopted by their foster parents. Ms. Torres stated that she was not confident that Matthew was capable of appropriately caring for N.O. and K.O. She explained that she did not believe Matthew had an adequate understanding of K.O.'s medical condition and noted that he sometimes seemed to not fully comprehend the important details of case-planning timelines and the degree of progress needed for reunification when they were communicated to him. She further noted that the children are bonded to the foster family and that the foster parents are well-acquainted with K.O.'s special needs stemming from his PADDAS syndrome diagnosis. Throughout her testimony, Ms. Torres maintained that the obstacle to Matthew's reunification with his children was his inability to safely parent and that it was never a question that he loves his sons.

DCYF next called Donna Goldin, a board-certified behavior analyst and a clinical supervisor in the Specialized Family Support Program at the Groden Center. Ms. Goldin explained that she oversees three case managers in the Groden Center's program, which seeks to help bring about the reunification of parents with their children who have been removed by DCYF. She added that she came to know Matthew as a participant in that program and that she also attended some of Matthew's visitations with his children.

Ms. Goldin testified about the treatment plan that was developed for Matthew at his "intake" at the Groden Center in August of 2021. She stated that she created a "child and family assessment" with Matthew's background information and that she set goals to address his ability to care for the children effectively and without staff assistance. Ms. Goldin recalled that "during most visits [Matthew had] struggles in managing the children."

Ms. Goldin testified that Matthew was eager to work with the Specialized Family Support Program and that he remained open to their suggestions. However, she noted that that he consistently struggled with time management and multitasking. She testified that she and her colleagues were required to go through Matthew's treatment plan with "significant repetition" due to their concerns about his "ability to retain the information * * *." Ms. Goldin explained that Matthew struggled to read emotional cues manifested by N.O. and K.O. and that he needed to be prompted by the staff to respond to his children's needs. She recalled one visit where N.O. sustained a minor cut from a pair of safety scissors and Matthew had to be prompted by the staff to comfort him and tend to the injury. Ms. Goldin added that Matthew persistently struggled with punctuality and rigidity. She also noted that he displayed obsessive behaviors.[6]

---

[6] Ms. Goldin testified that, on one occasion, Matthew arrived on time for a visit but proceeded to sit in his car organizing materials and missed a fun activity with the children as a result.

Ms. Goldin testified that she and other members of Matthew's care team discussed the possibility of an open adoption with him. However, she said that Matthew was adamant that he was seeking reunification and that he was not interested in the other options. She further testified that Matthew refused to sign a release to allow the Groden Center to communicate with his mental health counselor. She provided that, due to Matthew's overall lack of progress, he was discharged from the Groden Center in April of 2022.

Ms. Goldin testified that she enjoyed working with Matthew, but that she was concerned about his ability to parent the children. She testified that she believes Matthew loves his children and that the children love him, but she also said that she was "very, very concerned about [Matthew's] ability to look after his children full-time." She explained that Matthew consistently struggled with "[b]eing able to manage both the children's needs * * * at the same time * * *." Ms. Goldin concluded that, based on her observations, she did not recommend reunification. She stated that while "[t]here were certainly improvements in some areas[,]" there was not enough improvement to support reunification with his children. She further noted that she was especially concerned about Matthew's ability to parent K.O. due to his special needs.

DCYF next called John Parsons, Ph.D. Doctor Parsons testified that he conducted a six-session psychological assessment and parenting evaluation that took

place between October of 2018 and February of 2019. Doctor Parsons described Matthew as having "concentration abilities" that were "short" and "tangential," and he determined that Matthew operated approximately at a third-grade reading level. He also discussed Matthew's difficult and abusive upbringing as well as his history with substance abuse.

Doctor Parsons testified that he measured Matthew's intelligence using the Fourth Edition of the Wechsler Adult Intelligence Scale and found that Matthew had an I.Q. level of seventy-four, which was unlikely to change. Doctor Parsons also testified that Matthew's I.Q. score showed a weakness in verbal communication and difficulty in dealing with distractions.

Doctor Parsons testified that, upon performing psychiatric evaluations on Matthew, he diagnosed him with borderline intellectual functioning, alcoholism in early remission, bipolar disorder, unspecified ADHD, child neglect (as a victim), post-traumatic stress disorder, and adult antisocial behavior. However, he further testified that he had not seen Matthew since their last meeting in February of 2019, and thus he was unaware of any changes or progress that Matthew had made in the time since. He posited that, while Matthew's intelligence level would not preclude him from effectively parenting the children, his intelligence level and personal history are factors that might make parenting more difficult for him. He ultimately concluded that the reunification of Matthew and his children presented a "significant

- 11 -

risk." Doctor Parsons did note, however, that he found Matthew to be "enthusiastic" in his pursuit of reunification and that he had "no doubt that he want[ed] to be a parent" to his children.

DCYF's final witness was Timothy Enright, a DCYF Child Support Technician (CST) who had been assigned to Matthew and his children since September of 2019. Mr. Enright testified that he transported N.O. and K.O. to their visits with Matthew and that he also supervised those visits. He testified that, generally, he aims to have the parents "lead the visit," but that Matthew was unable to do so.

Mr. Enright testified about some obstacles in the first visit, including Matthew's lack of confidence and the children's initial resistance to the visit. He added that, while he observed that the children became more eager to spend time with their father after the initial visit, Matthew continued to lack confidence. Mr. Enright gave two examples of instances when Matthew's lack of parental skills affected the children, including one occasion when Matthew failed to notice that N.O. had to use the restroom and another when Mr. Enright had to intervene because N.O. had run off into a parking lot.

Mr. Enright testified that Matthew was active, hands-on, and loving with his children. However, he also stated that he observed Matthew struggling to understand K.O.'s special needs and having trouble cleaning up and managing the children

independently at the end of the visits. Mr. Enright testified that he had "concerns" about Matthew's ability to safely parent his children.

On May 3, 2023, the trial justice issued an eighty-five-page decision granting DCYF's petition to terminate Matthew's parental rights to N.O. and K.O. After providing a detailed summary of the relevant testimony from each of the witnesses, the trial justice proceeded to make eighty-two findings of fact.

The trial justice first found that DCYF had met its burden of showing, by clear and convincing evidence, that Matthew was unfit to parent his sons safely. The trial justice acknowledged that Matthew had successfully overcome many challenges; but she nonetheless found that Matthew was "unable to demonstrate that he has the capacity to meet his children's needs in light of his cognitive limitations and poor [judgment] * * *." The trial justice further noted that Matthew was resistant to mental health treatment and had not sufficiently engaged with his providers to address the barriers to reunification.

The trial justice then found that DCYF had made the requisite reasonable efforts to provide Matthew with services aimed at reunification with his children. She noted that reasonable efforts depend upon the unique circumstances and capacities of the parents involved and that the court assesses DCYF's efforts by looking at the "totality of the circumstances." Ultimately, the trial justice found that DCYF had sufficiently engaged in reasonable efforts to reunify Matthew with his

children by offering him services related to mental health and parenting skills that were appropriately tailored to his cognitive abilities.

The trial justice concluded her decision by finding that Matthew's deficits were "an insurmountable barrier to his ability to benefit from [DCYF]'s reasonable efforts * * *." She noted that N.O. was removed from his parents' care at twenty months and that K.O. has never lived with his father or had an unsupervised visit and that both N.O. and K.O. were well cared for by their foster family. Accordingly, she determined that it was in the best interest of N.O. and K.O. that Matthew's parental rights be terminated. In sum, the trial justice found that DCYF had met its burden of proving grounds for termination by clear and convincing evidence and, as such, she granted the petition to terminate Matthew's parental rights. Decrees terminating parental rights entered in each case on May 8, 2023.

Matthew timely appealed the decrees of the Family Court. Matthew's sole contention on appeal is that the trial justice erred in finding by clear and convincing evidence that DCYF had made reasonable efforts to achieve reunification between him and his children.

**Standard of Review**

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Elana W.*, 249 A.3d 287, 293 (R.I. 2021) (quoting *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019)). "Given the drastic and

- 14 -

irreversible nature of a decree terminating parental rights, 'the right to due process requires that the state support its allegations by clear and convincing evidence.'" *Id.* (quoting *In re Violet G.*, 212 A.3d at 166).

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Elana W.*, 249 A.3d at 292 (quoting *In re Violet G.*, 212 A.3d at 166). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id*. (quoting *In re Violet G.*, 212 A.3d at 166).

**Analysis**

On appeal, Matthew argues that the trial justice erred in finding that DCYF made reasonable efforts to reunify him with N.O. and K.O. He asserts that DCYF failed to recommend placements or providers other than the Groden Center that may have been better suited to his needs. Matthew contends that he fully participated in the Groden Center's parenting program, but that he could not make sufficient progress there due to his "specific cognitive issues." He maintains that DCYF should have found him an appropriate placement more tailored to his limitations. Matthew points to his independent and stable living situation, ongoing sobriety, and independent treatment by mental health professionals as evidence that he is able to

make positive improvements and could successfully parent with the appropriate support.

The guardian *ad litem* contends that DCYF has made the requisite reasonable efforts to reunify Matthew with his children by referring him to services that address parenting skills and mental health issues. The guardian *ad litem* asserts that Matthew was referred to the parenting program at the Groden Center "because that program was tailored specifically to working with parents like [Matthew, who] have cognitive limitations and [it] would allow for him to be observed interacting with the children directly."

DCYF similarly asserts that the Groden Center was "specifically tailored" to Matthew's needs. In its brief, DCYF emphasizes Matthew's "lack of progress" at the Groden Center and the "static" nature of his cognitive limitations. DCYF further notes that Matthew opted to find his own mental health care providers and resisted requests for him to sign releases to the Groden Center. When Matthew eventually did sign a release for DCYF to contact his provider, the agency was told that he made "little progress" due to his lack of attendance at appointments.

"In order for the Family Court to terminate a parent's rights under § 15-7-7(a)(2)(vii), it is incumbent upon DCYF to establish, by clear and convincing evidence, that it employed reasonable efforts to encourage and strengthen the parental relationship." *In re Manuel P.*, 252 A.3d 1211, 1220 (R.I. 2021) (quoting *In*

*re Briann A.T.*, 146 A.3d 866, 873 (R.I. 2016)); *see also* § 15-7-7(b)(1). "DCYF must also 'establish by clear and convincing evidence that it offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care.'" *In re Manuel P.*, 252 A.3d at 1220 (quoting *In re Briann A.T.*, 146 A.3d at 873). However, DCYF is not required to demonstrate that it "undertook 'extraordinary efforts'—indeed, the legal requirement under the statute is simply 'reasonable efforts' on the part of DCYF, and 'the reasonableness of such efforts must be determined from the particular facts and circumstances of each case.'" *Id.* (quoting *In re Briann A.T.*, 146 A.3d at 873). Even when DCYF has made the requisite reasonable efforts, "reunification may not always be possible." *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013).

Here, the record clearly establishes that Matthew is a loving father. The record also indicates that Matthew has made commendable efforts to improve himself and his parenting skills. Specifically, the trial testimony established that he is resolved to maintain his sobriety, has treated his gambling addiction, and has cooperated with DCYF and the Groden Center program. The record further reveals, however, that he was unable to make the improvements necessary to increase his visitations or show that he possessed the capacity to appropriately care for his children. The record reflects that Matthew's fiancée had been a positive factor in support of reunification prior to her medical complications; however, Matthew never demonstrated the level

- 17 -

of progress that he needed in order to show that reunification or increased visitations were warranted, even with her involvement. We have previously stated that "[m]erely completing some of the referred programs, without the accompanying behavior change, is not enough to support reunification." *In re Elana W.*, 249 A.3d at 294.

Although we acknowledge that Matthew deeply cares for his children, it is nevertheless our opinion that the trial justice appropriately found that DCYF made sufficient reasonable efforts to reunify him with his children. As was established through the testimony of the witnesses, Matthew has been provided with tailored services and individualized support. However, even with these specially tailored services, Matthew has made insufficient progress in improving his parenting abilities and has not demonstrated that he is capable of implementing the skills he was schooled in at the Groden Center. *See In re Raymond C.*, 864 A.2d 629, 633 (R.I. 2005) (explaining that additional services would be futile where the parent's mental illness remained an insurmountable obstacle to reunification). Upon carefully reviewing the record, it is our view that, despite DCYF's reasonable efforts to provide him with the appropriate parenting tools, Matthew has continued to struggle with effectively responding to the needs of his children.[7]

---

[7] In three years while attempting to reunify with his children, Matthew's visits increased only from one hour to two hours; they never increased in frequency nor progressed into home or unsupervised visits. This was Matthew's second TPR case

Additionally, Matthew was insistent on pursuing mental health treatment without the assistance of DCYF. While we acknowledge that it is acceptable for a parent to seek mental health care outside of a DCYF referral, the record, in this instance, is unclear as to the scope and extent of the mental health treatment that Matthew engaged in, due in part to his initial refusal to sign releases and to his inability to regularly take part in sessions. *See In re Gabrielle D.*, 39 A.3d 655, 668-69 (R.I. 2012) (Goldberg, J., concurring). The trial justice found that Matthew's failure to consistently attend appointments was "the greatest barrier to his achieving a benefit from mental health treatment." She concluded that Matthew was resistant to mental health treatment and was not appropriately engaging with his providers to address his impediments to reunification. We concur. It is clear to this Court that DCYF engaged in reasonable, although perhaps not extraordinary, efforts to reunify Matthew with his children; unfortunately, Matthew was unable to make the progress necessary for that reunification. *See In re Manuel P.*, 252 A.3d at 1220 ("This Court has never required a demonstration by DCYF that it undertook 'extraordinary efforts' * * *.") (quoting *In re Briann A.T.*, 146 A.3d at 873).

Once it was determined that Matthew was unfit,[8] the trial justice then analyzed whether adoption is in the children's best interest. "A determination of the best

---

with the same trial justice, and although she gave him every opportunity to improve, he has been unable to demonstrate that he is fit to parent his children.

[8] We note that respondent has not challenged the finding of parental unfitness.

- 19 -

interests of a child includes the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re Elana W.*, 249 A.3d at 294 (quoting *In re Christopher B.*, 823 A.2d 301, 317 (R.I. 2003)). The children have lived with this foster family for about seven years, the vast majority of both of their lives, and, by all accounts, they are both thriving. While this Court has no doubt as to Matthew's genuine desire to parent his children, N.O. and K.O. cannot be expected to wait an indeterminable length of time for their father to be equipped to appropriately care for them. *In re Manuel P.*, 252 A.3d at 1221 (noting the importance of permanency in determining the appropriate placement for children).

Accordingly, we affirm the trial justice's determination that DCYF employed the requisite reasonable efforts toward reunification. The trial justice's findings of fact are supported by the record, and we therefore find no basis to hold that the trial justice erred in finding that DCYF made the requisite reasonable efforts to reunify Matthew with N.O. and K.O.

## Conclusion

For the reasons set forth herein, we affirm the Family Court's decrees. The record may be remanded to the Family Court.

**Justice Robinson, dissenting.** I respectfully dissent. I hasten to state that I do not take issue with the thoughtfully written opinion of the majority—as far as it goes. What troubles me and has prompted me to write this brief dissent is that I believe that this case is being prematurely decided.

My concern stems from the very pertinent statement made on August 30, 2024 in the Supplemental Statement filed by the Public Defender who represents respondent.

The following is the full text of that Supplemental Statement:

> "Regarding the main substance of his appeal, [Matthew] rests on his pre-briefing statement. The purpose of this supplemental statement is to update this Court with information about [Matthew's] current living, work, and volunteer situation.
> [Matthew] would like the Court to know that he has gained Section 8 housing and is currently living in a stable, two-bedroom apartment in Cumberland with his partner Joyce. *Joyce, who has been hospitalized earlier this year with some serious medical issues, has been home since April 29, 2024, and is now ambulatory and able to assist with the child-rearing.* [Matthew] would also like the Court to know he is a member of the Fourth Degree of the Knights of Columbus and is active with two different chapters, and is active in the Knights' volunteer efforts, especially with veterans. Matthew * * * loves and misses his sons very much, and he is looking forward to welcoming them home." (Emphasis added.)[1]

---

[1] The Supplemental Statement also contains a "Conclusion," which reads in its entirety as follows: "For all of the foregoing reasons, and for those that may be presented in any subsequent submissions and during oral argument, [Matthew] respectfully requests that the decision of the Family Court be reversed and

The representations in that Supplemental Statement made by the Public Defender who is Matthew's attorney strike me as being of critical importance. I realize that those representations of the Public Defender describe events that have occurred *after* the record was closed and *after* the trial justice rendered her decision; but they are representations of great significance. Even though they were not made under oath, I have absolutely no reason to doubt the veracity of those representations. I am confident that the Public Defender would not hesitate to make the same representations under oath.

The potential dispositive importance of those representations becomes evident when one considers the references in the record to the role of Joyce in this case.

For example, in the course of her decision, the trial justice summarizes the testimony of Laura Torres (a social worker with seventeen years experience at DCYF) and indicates that Joyce (whom the trial justice refers to as Matthew's "fiancée") had told Ms. Torres that "she was open to helping [Matthew] succeed * * *." Ms. Torres indicated that Joyce "could be an appropriate added resource for [Matthew] and the boys." Ms. Torres then went on to state that Joyce had experienced "a tragic medical event in December of 2021" and was then in a nursing home.

---

remanded, with instructions to re-commence reunification efforts with his sons, [N.O.] and [K.O.], forthwith."

At another point in her decision, the trial justice writes that "Ms. Torres testified that she had hoped that [Matthew's] fiancée, Joyce, could serve as a possible support for reunification, but her medical situation derailed this possibility."

This is why the representations made in the Supplemental Statement are so important. The trial justice issued her decision on May 3, 2023. The Supplemental Statement was not filed until August 30, 2024—over a year after the issuance of the trial justice's decision. I think that, as a matter of fundamental fairness (if not more), it is imperative that the trial justice and eventually this Court be given the opportunity to take this new evidence into account. If that does not happen, Matthew will never have had a *full* trial on the merits with the trial justice being apprised of *all* the pertinent evidence.

It is clear from the Supplemental Statement that Joyce, who the Public Defender states is living with Matthew "in a stable, two-bedroom apartment in Cumberland," has recovered from her medical problems and "is now ambulatory and able to assist with the child-rearing."

It seems to me that this is a crucially important change in circumstances— and, very importantly, brings to our attention facts that could not have been known at the time of the trial or at the time of the issuance of the trial justice's decision.

It is my strongly held opinion that the Public Defender's representations about the radically improved state of health of Joyce and the fact that she is living with

- 23 -

Matthew "in a stable, two-bedroom apartment in Cumberland" and "is now ambulatory and able to assist with the child-rearing" should be taken into account before the terrible swift sword of judicial power is wielded so as to terminate the parental rights of Matthew—a man whose essential goodness is referred to over and over again in the record.

I cannot help but ask: What are we doing here? In a society that is replete with widespread illegal drug abuse, ceaseless urban violence, irresponsible parenthood, and contempt for traditional values, why should this venerable Court hasten to terminate the parental rights of this good man before the recent important change in circumstances is considered and taken into account by the Family Court and ultimately by this Court?

I repeat that I have genuine respect for the carefully crafted opinion of the majority. My only reservation (and it is one about which I feel very strongly) is that this Court in this instance is moving too fast. I firmly believe that this case should be remanded to the Family Court with instructions that it conduct a further evidentiary hearing that would address the events that have occurred since this case was appealed to this Court more than two years ago. I respectfully submit that such a result would be consistent with due process and fundamental fairness. Indeed, it would be consistent with "justice"—which, as Justice Kelleher reminded us so many

years ago, "after all, is the true purpose of a court's existence." *Wilkinson v. Harrington*, 104 R.I. 224, 230, 243 A.2d 745, 749 (1968).

The foregoing considerations are of particular gravity in view of the fact that we are dealing with a constitutionally protected liberty interest. We have very often alluded to the fundamental principle that "[n]atural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." *In re Destiny D.*, 922 A.2d 168, 172 (R.I. 2007) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). In the same vein, this Court has expressly endorsed the following statement by the Supreme Court of Virginia: "The termination of parental rights is a grave, drastic, and irreversible action." *In re Kayla N.*, 900 A.2d 1202, 1210 (R.I. 2006) (quoting *Lowe v. Department of Public Welfare of Richmond*, 231 Va. 277, 343 S.E.2d 70, 72 (1986)).

For these reasons, it is my view that this Court should not decide this case at this time but should remand it to the Family Court for it to consider the representations articulated in the Supplemental Statement. For that reason, I respectfully dissent.

## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re N.O.<br>In re K.O. |
| **Case Number** | No. 2023-224-Appeal. (PJ 22-2677)<br>No. 2023-226-Appeal. (PJ 22-2678) |
| **Date Opinion Filed** | June 17, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Lia N. Stuhlsatz |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Brian Alexander Terry, Esq.<br>Misty Delgado, Esq. |
| | For Respondent:<br><br>Angela M. Yingling<br>Rhode Island Public Defender |